Case number 22-1024, United States of America v. Van Williams and 22-1038, United States of America v. Jamar Williams. Oral argument, I thought we'd see 15 minutes, I'm sorry, 20 minutes to be shared by the defendants and 20 minutes for the plaintiff. Ms. Brown, you may proceed for a couple of minutes. Good morning, and may you please report forward. My name is Catherine Brown, and I represent Appellant Vanjie Williams. Counsel for the police has agreed to cede five minutes of his time to me, and with this confirmation I would like to reserve three for rebuttal. Thank you. Mr. Williams was the driver in the Michigan traffic stop at Ishtar. The district court erred when it denied the motion to suppress evidence from this traffic stop. Although the district court correctly concluded that Officer Lay had abandoned the traffic-related mission of her stop by the time she had approached Mr. Bloom, the district court erred in finding that there was reasonable suspicion to justify detaining Mr. Williams and her brother. There also was no reasonable suspicion to justify interrogating Mr. Bloom about a potential probation violation. Accordingly, this court should reverse. First, the district court correctly found that Officer Lay had abandoned the traffic-related mission of her stop, tailgating, by the time she had approached Mr. Bloom. At this point, she had collected the driver's licenses from Mr. Bloom and Mr. Williams, ordered Mr. Williams to exit the vehicle, had a brief one-minute conversation with Mr. Williams, and then she entered her cruiser. At this point, she ran the information from the defendants. At this point, she could have issued the citation, but she had determined not to do so. Instead, she embarked on a new investigation into a probation violation by Mr. Bloom. So at this point, she had abandoned the traffic-related mission of the stop. Let me ask you this. During that little one-minute conversation, she asked him where he had been, and he said, I've been vacationing in Indiana. Is that what he said? That's correct, Your Honor. But before that, while she was still following him after she observed the tailgating, she had checked his license plate already, right? And found out that his car had been rented the day before in Houston, Texas, right? That's correct, Your Honor. So in that, getting to the heart of maybe your problem, that here he says, hell, I was vacationing in Indiana, and yet 24 hours earlier he had been in Houston, Texas. That's a little bit inconsistent, right? Your Honor, Ms. Lay had no, or Officer Lay had no idea whether Mr. Williams had been on vacation in Houston. There's nothing in the record that indicates a vacation in Houston is inconsistent with that. Driving home, it's a long drive from Houston to Detroit, obviously, and taking a break in Indiana before waking up the next morning and continuing home. What if I say he was vacationing in Indiana, not vacationing in Houston? At this point, it was boring. Judge Riedler, he had just woken up, and it was accurate for him to say that he had most immediately been vacationing in Indiana. And he did respond accurately to Officer Lay's question, where are you coming from right now? And he said, Indiana. If she had asked him whether or not he had, in fact, been in Houston, and he had given an evasive answer or had perhaps denied being in Houston, then she probably would have had enough of a reasonable suspicion based on this trial. Based on the fact that Mr. Williams said he had just been in Indiana, wouldn't that give reasonable suspicion for Officer Lay to suspect that Mr. Bloom had also been in Indiana, thus reasonable suspicion to believe that he violated his probation? First, at this point, Officer Lay had encountered a Michigan probationer, Mr. Bloom, in Michigan. At this point, she did not know where his whereabouts were. By the time she was in the cruiser, she had read the rental agreement, she knew that the rental was not Mr. Bloom's, and she did not know when he had joined Mr. Williams in his travels, if at all, before Michigan. Weren't you allowed to ask that question? Where are you just coming from? If she had asked that question as part of the traffic stop, such as during downtime when she was working on the citation, she could have asked that question. But by the time she approached Mr. Bloom in this case, she had already abandoned the traffic-related mission of the stop. So before she approached Mr. Bloom, she needed to have reasonable suspicion. And at this point, she did not have any. She knew that he was in Michigan, which would be consistent with her understanding of his probation, and she had just pulled him over from Benton Harbor, a little bit past Benton Harbor. So for all she knew at this time, Mr. Williams could have picked up his friend in Benton Harbor. She certainly had a hunch, but she didn't have an objective indication about his whereabouts that would have risen to the level of reasonable suspicion. So what is this concept of abandonment? In other words, she goes back to the cruise and she learns a new fact, which I think gives her a bit more thought. But is your point that she has to— I mean, why couldn't she have gone back to the car under both purposes? We have the stop, and there's some conflicting information. Now we have the probation status, and there's sort of more to learn, but why couldn't it have been both, or why does it have to sort of switch from one to the other? Could you clarify a bit further what you mean? Well, you keep saying that it then switched to investigation. She abandoned. Your word is abandoned. Right. What does that mean? What do you mean by abandoned? Why did she have to abandon him? Why did she also have in mind the traffic stop and those information issues? So under United States v. Rodriguez, an officer's authority to effectuate a traffic stop is tightly tethered to the traffic-related mission. And so if Officer Lang had been diligently completing tasks incident to that traffic stop, that would have been appropriate. And then during that point, she had learned more information. That would have been fine. But here, she testified that she had, in fact, decided not to issue a citation and that she had moved on to a separate investigation, specifically probation. And her actions after this point show that she was no longer pursuing the traffic-related mission. She asked Mr. Bloom whether he was on probation, asked him if he had been in Indiana with Mr. Williams, and even when she re-approached Mr. Williams, she couched her questions as trying to figure out whether Mr. Bloom had been with him in Indiana to figure out if he had violated a term of probation. And under United States v. Rodriguez, the best measure of an officer's diligence is what the officer, in fact, does. And here, Leigh was, in fact, not pursuing the traffic-related mission at this time. So when she had abandoned that mission, she needed to have independent reasonable suspicion, at least prior to when she approached Mr. Bloom. This year, she did not. If we determine that there was reasonable suspicion for Officer Leigh to believe that there was a probation violation, how does that impact your argument? Was any of the other questioning problematic? So if this court determines that Officer Leigh had reasonable suspicion to investigate the probation violation, if I understand the question, Judge Mathis, that wouldn't impact reasonable suspicion for Mr. Williams in this case. Here, Officer Leigh suspected Mr. Bloom of being in Indiana, which would have been problematic because he was on probation, and she made the assumption that he would not be able to leave the state. That has nothing to do with my client, Mr. Williams. Williams wouldn't answer that. He would acknowledge where he picked up on a pretty straightforward question that would normally be easy to answer. That didn't give some suspicion as to maybe he was in a crime where they were conspiring to do something together. At that point, potentially, but importantly, Rodriguez rejected the idea that there are de minimis assumptions of a traffic stop. So what's important is that at the moment the traffic stop ended, there has to be independent reasonable suspicion. If there's a break in the chain between when the traffic stop ended and then when Officer Leigh had determined she had reasonable suspicion, that's the end of the inquiry. Which reasonable suspicion for what? For Mr. Williams, for either. I don't know why I said that. No. It's segmented where there's the stop, then the probation, and then Williams, going back to Williams, is like another abandonment of the first two. It seems like we're cutting this really close. This is all kind of part of one series of events. Each of the facts kind of related to each other. So you're carving out Williams because it didn't quite follow the argument. So not that you're throwing your friend on your side overboard, but assuming it's appropriate to approach the car and speak to Bloom, then Williams gives answers that are arguably suspicious themselves. So is there some timing issue? I'm not sure. I think there is an important timing issue, and this Court's opinion in Whitley is particularly instructive on this point. At each phase of the traffic encounter, or the overall encounter, it either has to be part of the traffic stop or there has to be independent reasonable suspicion. So it is necessary to parse finally... So we have suspicion as to Bloom. Potentially. So at this point, there's nothing further to detain Mr. Williams for in officer-related... Well, but aren't inconsistent travel plans enough to arrange reasonable suspicion? Don't we have cases that say that? It can be, but in this case, prior to her approach of Bloom, officer-related, not word of any sort of inconsistency in travel plans between Mr. Williams and Mr. Bloom. Well, I'm talking about Mr. Williams between his rental car in Houston versus on vacation in Indiana. At this point, Officer Lake had a punch that there was potentially something amiss with this explanation of travel plans, but without asking any other follow-up question, which she could have done at this time, as you recognize, Judge Gilman, she knew that the car had been in Houston before she ever had a vehicle to approach, but she didn't ask them. At this point, she had some incomplete information, and without more, she had a punch that had not yet been made. Do you have a case that is close on this that would say when a hunch becomes just a hunch versus reasonable suspicion? I do. United States v. Smith is helpful on this point. It's not exactly the same, factually, but there this panel recognized  that the travel plans are dubious or inconsistent, it's just an officer's hunch and that sometimes it's necessary for the officer to ask follow-up questions to ripen that hunch into reasonable suspicion. Well, isn't it inconsistent for Mr. Williams to say that he was vacationing in Indiana when, in fact, the rental agreement showed that he was in Houston 17 to 18 hours prior? So the rental vehicle had its place around Houston about 26 hours prior, and on this record, there's no indication that Mr. Williams could not have been on vacation in Houston during the 17 or 18 hours, stayed, visited a friend in Indiana which would have been part of that vacation before returning home. But, I mean, he didn't say he was vacationing in Houston. He said he was vacationing in Indiana, right? That's true, but Officer Ley did not ask him where all did you go on your vacation. She asked him, where are you coming from? And he said, I was on vacation in Indiana. And one thing that might be helpful is that Ley herself at this point testified that she did not believe she had reasonable suspicion. She specifically testified that she thought she had reasonable suspicion once she had re-approached Mr. Williams a second time and he had become more evasive and no longer wanted to answer Officer Ley's questions about Bloom's whereabouts. And perhaps most importantly, if there were reasonable suspicion to detain Mr. Bloom, she lacked reasonable suspicion to detain Mr. Williams so she should have told him he was going to go. Thank you, Counsel. We have time for a vote. And we'll hear from Mr. Taylor. Good morning. My name is Jeff Taylor. I represent the appellant, Mr. Bloom. I would just like to address a few points as it relates to the purpose of the travel. There has been some discussion about Mr. Bloom having been potentially in the state of Indiana. I would suggest to the court that my client was a passenger in a motor vehicle that was 35 miles away from the state line. That proximity by in and of itself actually means nothing. Moreover, I would not readily concede that even if the officer believed that my client had been in Indiana, that could have been a direct question to him. And she had no basis to believe anything other than I'm stopping someone in the state of Michigan. I have no direct knowledge that they were or were not in Indiana personally because she stated during the evidentiary hearing that she had no idea how long my client had been in that vehicle that day, whether he was picked up close to the state line or otherwise. Additionally, I would state that merely even if he was in Indiana, all probations don't restrict a person from travel. If there's permission given for purposes of employment, whether it could have been a funeral, but merely because of a person that may have said that, she cannot verify that my client was even a passenger at the time that that person traveled through the state of Indiana. The fact of the matter is that there are circumstances that would warrant a further inquiry. But having said that, in this case, there was absolutely no evidence that my client was in Indiana. She began a secondary investigation as relates to that fact. But in this case, there was absolutely no, even by her own admission, she had no evidence to believe one way or the other whether he had been in the car during the entire portion of travel. And so, I would not readily concede anything other than that may be the right hearing as it relates to my client. My client was cooperative. He was not fidgety. He voluntarily cooperated and had the right opportunity. Mr. Taylor, the panel is trying to ask some questions. And additionally, Mr. Taylor, the panel is trying to ask some questions, sir. Oh, I'm sorry. I couldn't hear. I need to flag. I apologize. That's okay. So, all of the points you're making are possibilities. And why does the officer have the right, once she sees the probationary status, to go sort of ask about these things? I mean, you're right that all of these you said might be right, but there were certainly questions about them. Picked up 35 miles north of the border, but heading north, at least there was some indication that someone had been in Indiana previously. So why isn't that enough for the officer to go back and ask more questions? And then when she asks more questions, she gets some unusual answers like they're going to Tribes and they're also going to Saginaw. The officer acknowledged that she did ask those questions and when she asked those questions, she readily conceded at the eventual hearing that the answers, because she did not know whether these two individuals were related, may not have been inconsistent at all. Her response to the answers, because my client did not acknowledge that he had been in Indiana, was to then call a trial. I think that her efforts stretch well beyond the intent and the mission of the initial traffic stop in that she had not received, even though she had information that he might have been on probation, she did not receive any information that would have allowed her at that point to quote-unquote arrest my client for any probation violation or for any criminal activity. There was simply no suggestion that criminal activity was afoot. Despite her generalizing her suspicions, they were not particularized, they were not objective. They just related to the probability or possibility, excuse me, that he may have been in Indiana, but no warrants for his arrest, nothing evidencing that my client had committed an offense. In the case, United States v. Plum cited by the government, there was a violation related to a probation investigation where one of the basis for the extended detention was there was a marijuana smell in the vehicle, and therefore because she was aware that that person was on probation, it was very unlikely that that was permissible for that person to be smoking or in the practice of contraband. In this case, there was no such indicators. I just want to hold on for a second. Anyone have any questions for counsel? Okay, if you want to wrap up, then that's great. Thank you for your time this morning. Good morning, panel. Thank you for the opportunity to appear in Memphis. I was last in this building 35 years ago when I left Judge Welford's employment as a law clerk, so I have not been back until yesterday. I think the way I would like to start here is to remind the Court how low the level is for reasonable suspicion. For that, I'd like to go back to first principles and remind the Court that the Terry case provides a pretty good example of how low reasonable suspicion is as a standard proof. If you go back and read that case, it involves an experienced Cleveland police detective watching two or three men walk back and forth in front of a downtown store, look through the window, and then talk to each other. That's it. That detective, who had been on the force for 35 years, identified that as behavior that, sure, it would look innocent probably to most of us, but his experience was that looked like a store to be robbed. That's why he walked up to the men, he frisked them, and then we all know what happened as a result of that. When are you saying the purpose of the original stop ended? The District Court, I think it's important to go back to what the District Court found, because we're dealing with that. Judge Garbo said at seven minutes into the stop, which for reference purposes is about when she got out of her squad car after doing the data checks, she said that Trooper Lay had substantially completed all of the steps necessary to finish the mission, if you want to use that term, of this traffic stop. Now, she didn't say it was over yet, because she went on to say, and I'm referring here to... make sure I get the page ready... She said what remained was for her, Trooper Lay, to issue a citation or let the defendants proceed on their way. I think we have to allow Trooper Lay to at least get out of the car and at a bare minimum return the two men's identification to them, because remember, she'd already had Williams' driver's license and registration, and if you'll recall one of the things that she thought was suspicious about Bloom was he didn't look at her and just kind of shoved his license at her when she was talking to Williams. So she still had his driver's license. So no matter what she's going to do, she at least has to be allowed to get out of the car and go back to these men and give them their licenses. So at that point, what reasonable suspicion is there at the point she's getting out of her car to return that license? Okay. For that, I would ask the court to review pages 153 and 154 of the district court's opinion where Judge Yarbrough laid out all the things that Trooper Lay had explained. And she did give quite a long list of things that she felt were reasonable suspicion. First and foremost, of course, has to be the travel plan idea. She talks to Williams. She already knows that at 8.30 Houston time, the day before, that the Tahoe that he'd rented for a month had been seen on a license reader. But when she asked Williams, where are you guys coming from? And please note that she mentioned both of them as found by the district court.  The answer she got from Williams was, I've been on vacation in Indiana. That's it. No mention of Houston, first of all, and no reference to having recently picked up Bloom. So, she's left to say, well, this guy's telling me he's been vacationing in Indiana. Tell me this, what was her right, did she have the right to even ask that question? What does that have to do with Taylor? I would say so, Your Honor, because the Rodriguez case says the officer can ask questions related to the traffic violation. And we are talking about a moving violation on a highway, and as Cole and Palazzo, I think a case that you played a role in deciding, talked about, asking the motorist questions about where they're going and where they come from is related to the travel. And the reason is, the person is traveling at the point that the officer has made the stop. Whether you're tailgating or not has nothing to do with where you come from or where you're going. Well, I would disagree with that, Your Honor, because of the Cole case that we cited in our brief, which is a Seventh Circuit case. But Cole really gets into the weeds about, well, why would that be permissible? And the answer is, according to the Seventh Circuit and according to them, every property does, is it is related because it might give context to why is this person committing this violation? And they give the example of, well, if somebody's speeding or tailgating, the officer has got a decision to make about whether to issue the violation or not. And they use the example of, what if the person's got a pregnant wife in the car and that's why they're speeding? What if they had a tail light out and they're just going down the cross country? That gives the officer information that they need to decide whether to issue the ticket or take whatever steps they need. So that's why I believe every circuit, including this one, is on record as saying you're allowed to ask, as part of the mission of a traffic stop, where you're coming from and where you're going to. Is Williams under any obligation to answer the question? No, but he's he shouldn't lie about it. I mean, if he does, it's suspicious. And I would also ask the court to focus on how experienced Trooper Lay was because reasonable suspicion, as we all know, requires this court to look at all the facts, not do a divide and conquer and, you know, knock down each one. And then view it through the lens of an experienced officer, if that officer had a strong conclusions based on that experience. And Trooper Lay was quite experienced. The record here tells us that she had stopped between 15 and 20 cars every day she was at work. And she had been on the job for two years at the time that the stop had occurred. So doing a little conservative extrapolating, we're talking about stopping 8,500 motorists at the point where she pulls over this Tahoe. And as she testified, that's page 424 if anybody wants to look it up. That gives her what she called a baseline of what's normal behavior for the average motorist and suspicious behavior in her mind based on her experience. So she talked about, to go back to your original question, you know, why didn't William  Why didn't he give her the story about this Indiana vacation? That's, of course, an important one. So I don't quite fully understand the point. If this was a rookie officer, this is the first person she pulled over that you'd be saying you're right, there's no reasonable suspicion. No, but I'm saying... I don't think you would be. No, I would not. But I would have a hard time saying, well, this officer's training and experience allowed her to draw a X, Y, and Z conclusion. She is very experienced, like the officer. Your answer was less the evidence and more the training of the officer. Judge Gilman's question kind of went to the evidence or the basis for the suspicion and you turned to the experience not really emphasizing the significance of the evidence. In other words, the evidence would have been viewed differently, so if it was a rookie officer this case would be very different? Well, for example, I guess the point I'm trying to make is that if it was my first day on the job as an officer and I said somebody that won't get in my squad car in January by the side of the highway in Michigan is suspicious, I think the three of you would be wealthy to rights to say if I don't think that's suspicious, why would I listen to an officer the first day on the job? She told us, just to use as an example, only two people in her 8,500 stops have ever declined, for example, her invitation to sit in her squad car while she takes care of this citation. Is it possibly an innocent explanation? Sure. But, you know, we're looking at all these things as a combination. But as to Williams, your friend on the other side makes the point that the officer approaches the vehicle the second time to talk about Bloom's probation violation and that has really nothing to do with Williams, and yet Williams is essentially detained that entire time for the purpose of talking to Bloom and the dog shows up. So is there some break there with respect to Williams where the stop is extended impermissibly? I would say no for a couple of reasons. First of all, she's got to go up to at least approach Bloom again for reasons I said already. She can't just drive off with his license, so she's got to go back to Bloom and Williams and give them their identification. Also, I hope that you'll recognize the record here does not support that there was extra time to get the canine officer to the scene. Let's just go back to the stop. So she has to go back to get the licenses back. She does more than that. Right, she talks to him because she's got reasonable suspicion of, I would say, a couple of things. The probation violation certainly is one because you know, they just crossed the Michigan-Indiana That's all as to Bloom. I'm asking about Williams. That's all as to Bloom. Okay. So what does she have against Williams? Part of the ten things that she talked about about Williams were the drug trafficking suspicion. She's coming. He was in Houston. He's going to Detroit, a drug supply city, she said, and a drug sale city, she said, on Interstate 94, which is a common corridor for drug trafficking. He had multiple cell phones. That's another thing that she alerted to. The fact that he was being deceptive about his travel at all goes to that because what's so not sure about Houston? This was most of the information learned during the initial stop. It is. I mean, your friend on the other side would just say, look, that's great. She can give a ticket to the drive at that point. If she wanted to, she wasn't actually going to, and case closed. She goes back to talk to Bloom. Williams, the main thing Williams does is not answer questions about Bloom at that point. Right. No. You're going to justify the detention of Williams as well. This was not briefed in the papers, but I did look at this and I'd be happy to supplement our position on this if you're concerned about it. The Supreme Court has said very clearly, in my opinion, that if you have reasonable suspicion in a traffic stop situation for a person, say there's multiple people in the car, you have the ability to detain all those people for the same reasonable suspicion time period. If she's got reasonable suspicion to detain Bloom because of a probation violation, I contend that the Supreme Court makes it very clear that everybody else is stuck until the reasonable suspicion is either gone or it blossoms into probable cause to arrest. We didn't brief that because nobody briefed it, but I would be happy to supplement what I've said with those cases. So that would be part of my answer. The other part of my answer, factually, is I contend she had reasonable suspicion for drug trafficking as to both of them, in addition to the probation violation, but the District Court hung its hat on the probation violation. Where's the reasonable suspicion for drug trafficking? Let me run through this real quick. Okay, to travel, I've already talked about that. Williams wouldn't join Trooper Lay in the heated car. That's one that the District Court noted. No eye contact from Bloom and him just shoving his driver's license to her without being asked. Traveling on Interstate 94, which is not the most direct route from Houston to Detroit. From Houston to Detroit, which Trooper Lay said, that's a drug supply to drug customers, say, if I can use that phrase. A rental vehicle, which had been rented for one month, which is a common tactic that drug traffickers use because they don't want their car seized and it breaks a little bit of the possession chain. She identified that. And the other fact, I guess, that the District Court spent discussing is of all the people that Williams could have had in this vehicle, if he had somebody, he's got somebody that's on probation for a homicide case. So, that adds to the mix according to the multi-test factor. And then, of course, the two cell phones. Was it obvious they were both Williams' cell phones? In other words, there's two people in the car. No. The officer testified that as we were watching the video, and I'm pretty sure this is in the transcript too, Williams is standing out front of her squad car and you can see he's got two different cell phones in his hand. So, he personally had two cell phones. And she said, again, it's not sinister to have two cell phones. I have two cell phones. So, this actually is not one for work. No one's going to accuse you of being a drug dealer, but that feels like a really loose basis to do so. But she did say that drug traffickers often do have two cell phones, one clean and one for drug business. So, that was another thing, based on her training and experience that she said, I took note of that. So, long story short, we've got this low standard of reasonable suspicion that a FOT case, for example, says it's an easy standard to satisfy. And justifiably so, because we're only talking about short-term detentions. And you either have to let the person go, if it doesn't blossom into probable cause, or if it does during that short period of time, then it can be a legitimate basis for holding somebody and then establishing probable cause. And I guess the last fact I want to make sure I put in front of the panel is, it's important to remember that Lay did not call a canine handler because it was a canine handler. Her testimony was, when she got in the car and ran the background checks and found this officer safety caution, she called the other person on duty on her team that day, who was Officer Beersma, who happened to be a canine before she even got out of the squad car. So it wasn't like she was hanging around, stalling for time and hoping this person would show up with the dog. They were there already. And it wasn't because he was a drug dog handler. He was just the other guy on duty. So I think it's an important thing to remember that this is not an officer stalling for time in order for the canine to get there. I look at this case as close to the line between whether she just had a hunch, which wouldn't be sufficient, or whether she had reasonable suspicion. Do you have a case anywhere comparable to this that would help clarify that line? Well, the problem with these search and seizure cases, Your Honor, is that they're all so factually dissimilar. It's hard to find something that's immediately on point. The only thing I can do is tell you... In many of these cases I've seen where they say, ah, there's a blunt sitting there in the console. There's something that indicates the legal substance. There's nothing like that. Nothing like that here. And in fact... Or there's a rap sheet for drugs on Williamson, which is nothing. He's got a clean record. Right. I think one thing that I think helps us in this case, the government that is, is that this is not one of those cases where we see where the officers are really investigating a drug offense and they find a pretext. I don't use the word pretext, but they find a reason to pull somebody over and it gives them an opportunity to snoop around about the drugs. Officer Lay didn't know anything about these two people before she pulled them over for this. So it wasn't like she was looking for an excuse to try and investigate drugs. But the government kept getting lies about the travel information, according to cases like Howard and Calabetti. Lying about that is a strong indicator when it comes to reasonable suspicion. And that's only one of the ten that we had here. We had that plus the multiple cell phones, the rental cars, the defensiveness that Williams had when Lay started to ask, well, where were you vacationing in Indiana? He goes, well, I work for a living. Here's my business card. She's like, what's that got to do with anything? Both she and the district court took that as he's trying to distract me from asking questions about where he's been, because it doesn't make any sense based on what I know about him being in Houston. So I see my time's almost up here. I guess I would like to end with a reminder that the exclusionary rule is a price that society is willing to pay, and justifiably so, but only when, in the words of Justice Cardozo, the constables wonder. So if the officer blew it in doing the search or, even worse, intentionally went beyond what the Fourth Amendment would permit, I submit this record shows that Officer Lay acted correctly, and the district court justifiably concluded she acted correctly, and I hope you will give deference the deference that's due to that decision made by our district judge. So unless you have questions for me, I see my time is up. Thank you very much. Thank you. I think you have three minutes. Yes. Thank you. I'd like to make two points during my rebuttal time. First is that the government just now pointed to factors that the district court allegedly considered during the opinion, but I'd like to remind the panel that Townsend, which stands for the proposition that a district court cannot consider factors not actually relied on by the trooper, remains the law. And here, when Officer Lay is explaining what factors she relied on for reasonable suspicion, she didn't point to anything related either to Mr. Bloom's officer warning or his probation. So for those reasons, I just wanted to point that out. The second is that... I thought she testified that she was investigating a probable probation violation. Didn't she testify to that as part of her reasonable suspicion? She testified that she had picked up a new investigation at this point, separate from the traffic stop, but when she lists the factors she considered for reasonable suspicion, Mr. Bloom's probation and his history played no part in that. But that would be important to review in the record. And the second point I want to make is about what happens when there's reasonable suspicion to detain a passenger but not a driver. This is actually an issue where there's very little case law. The only authority at one point that I could find was actually Professor Lefebvre, who observed that it's eminently possible that either a traffic stop could end or reasonable suspicion could be dispelled for detaining the driver, but that in the course of this exchange, there could be separate, unrelated reasonable suspicion to detain the passenger. And under these circumstances, the only result that makes sense in the Fourth Amendment is to tell the driver they're free to go. The other authorities that the government references, this idea that everyone is part of the stop and has to stick with the stop for deliberation, that's only for passengers. So drivers, since they have a car, it's acknowledged that passengers are sort of allowed for the ride, and that's why passengers are standing under Grendlin to challenge the sufficiency of reasonable suspicion and the constitutionality of the stop. But here we have a situation that's somewhat reversed. Here we have a passenger who may have some sort of a basis for being detained due to an unrelated violation here of probation. And as a reminder, Mr. Williams can't violate a term of Mr. Bloom's probation. And at this point, Officer Lay, if she determined that she was going to continue to detain Mr. Bloom to ask him about his probation, she needed to tell Mr. Williams that he was free to go. So what, do you drive off leaving this passenger on the side of the road? It's certainly offered, but that's what the Fourth Amendment would require. If she has no basis to detain him, then she has no choice. And of course, he could choose to stay, Judge Gelman, and turn it into a consensual encounter to wait for his friend. But in comparable situations, I see my time's up, but may I briefly respond? In comparable situations, for example, when either the driver or the passenger is arrested, the other driver or passenger isn't forced, of course, to go in for further detention or arrest. And so, under an analogous principle, it would require dismissing the driver under the circumstances. Can I ask about your Townsend point? Yes. There's been a lot of intervening Supreme Court precedent on the point that might go the other way. Would you acknowledge that? The government didn't point to any intervening Supreme Court precedent. Well, say the government did, then we have to pay attention to the Supreme Court. So if I think there's Supreme Court precedent that's come in, is there a case, is your point that we've never applied that precedent? We've never examined whether Townsend is still good law to intervene Supreme Court precedent. My point would be that there's no intervening Supreme Court precedent and that, for this reason, it remains good law. And, of course, as you know, it hasn't been unlocked. So it would remain good law. Okay. Well, thank you very much. I was. Yes. Well, thank you very much for your service and your excellent representation. Thank you. Case will be submitted. Thank you.